UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| JOHN P. WILSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 4:05-cv-6-WGH-DFH |
| | ) | |
| RICK BLAKER, JR., Individually and in his | ) | |
| capacity as an Officer of the Jackson County | ) | |
| Police Department, and | ) | |
| JERRY HOUNSHEL, in his official capacity | ) | |
| as Jackson County Sheriff, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

## I. Introduction

This matter is before the Honorable William G. Hussmann, Jr., United

States Magistrate Judge, on Defendants' Motion for Summary Judgment filed

April 25, 2006.  (Docket Nos. 33-35).[1]  Plaintiff filed his Brief in Response on

June 1, 2006 (Docket Nos. 36-37), as well as a Request for Oral Argument

(Docket No. 38).[2]  Defendants filed their Reply Memorandum on June 21, 2006.

(Docket No. 42).

---

[1]The parties consented to Magistrate Judge jurisdiction in this case in their
Case Management Plan filed April 28, 2005.  (Docket No. 11).  District Judge David F.
Hamilton entered an Order of Reference on May 3, 2005.  (Docket No. 13).

[2]Plaintiff's Request for Oral Argument is **DENIED.**

## II.  Background

Defendant Jerry Hounshel ("Hounshel") is the Sheriff of Jackson County, Indiana, a position he held in January 2003.  (Affidavit of Jerry Hounshel ("Hounshel Aff.") ¶ 1).  Ron Bruner was murdered on February 27, 1997, and after discovery of the murder, Hounshel, while still a deputy, conducted an investigation into the murder which resulted in an inconclusive result with no arrests made.  (Hounshel Aff. ¶ 2).  When Hounshel became Sheriff, he assigned defendant Rick Blaker ("Blaker"), a deputy of the Jackson County Sheriff's office, to continue the investigation of the Bruner murder.  (Hounshel Aff. ¶ 3; Affidavit of Rick Blaker ("Blaker Aff.") ¶ 1).

The murder of Bruner was believed, during the time of Hounshel's investigation, to have been related to Bruner's involvement with methamphetamine.  (Hounshel Aff. ¶ 4).  Blaker was involved with the investigation because he had experience and training with regard to the investigation of cases involving drugs and the use of informants.  (Hounshel Aff. ¶ 4).[3]  Blaker graduated from the Indiana Law Enforcement Academy on March 23, 1990.  (Hounshel Aff. ¶ 5 and Exh. 1).

Eventually, the Jackson County officers became suspicious of plaintiff John Wilson, among others, in Bruner's murder.  (*See* Blaker Aff. ¶ 2).  Richard J. Benton ("Benton") was an investigator for the office of the Jackson County

---

[3]Blaker's experience included attendance at special seminars regarding interviews and investigation techniques, and working together with Officer Carl Lamb of the Seymour Police Department on several drug investigations.  (Hounshel Aff. ¶¶ 4, 6 and Exh. 6).

Prosecutor in January 2003; he was investigating the Bruner murder at that time along with Blaker and Deputy Jim Burge ("Burge"). (Affidavit of Richard J. Benton ("Benton Aff.") ¶¶ 1-2).

Prior to plaintiff's arrest on January 21, 2003, for the murder of Bruner, both Blaker and Benton interviewed Martha Lee Ball ("Marty") and her husband Brad Ball ("Brad"); Marty informed them that she was the stepdaughter of John Wilson. (Blaker Aff. ¶ 2; Benton Aff. ¶ 3). Benton took notes of Marty's interview. (Benton Aff. ¶ 4 and Exh. 1).

According to Blaker and Benton, Marty told them during the interview that plaintiff appeared at her trailer shortly after Bruner's murder, holding a gun to his head.[4] (Benton Aff. ¶ 5). Plaintiff allegedly told Marty that "they" had just knifed a guy to death; the reference to "they," as related by Marty, referred to plaintiff, and others, in the context of the interview. (Benton Aff. ¶ 5; Blaker Aff. ¶ 3). Plaintiff then told Marty that the same individuals had loaded the victim's body in a van and were going to dump it, but changed their minds and took the body back inside. (Blaker Aff. ¶ 3; Benton Aff. ¶ 5). The murder weapon, a knife, had been disposed of, and Marty also stated that she had been shown by plaintiff where he disposed of the murder weapon. (Blaker Aff. ¶ 3; Benton Aff. ¶ 5).

---

[4]Defendants allege that during her interview with Benton and Blaker, Marty appeared to be of sound mind, spoke clearly, and recalled the events she described without suggestion. (Blaker Aff. ¶ 4; Benton Aff. ¶ 6).

According to Benton and Blaker's accounts of the interview, Marty went on to explain that, at the same time plaintiff appeared at her trailer with a gun to his head, plaintiff instructed Marty and a woman named Cathy to clean the blood out of his white van.  (Blaker Aff. ¶ 3; Benton Aff. ¶ 5).  Marty and Cathy promptly complied with plaintiff's request and found that there had been blood in the back of the van.  (Blaker Aff. ¶ 3; Benton Aff. ¶ 5).  According to Marty, plaintiff said he was making drug runs to California for Bruner, and Marty also told the investigators that plaintiff had also talked to her husband, Brad, about the Bruner murder.  (Blaker Aff. ¶ 3; Benton Aff. ¶ 5).

Additionally, Marty had an earlier conversation with investigators on September 4, 1997, when she identified two people in the murder and said someone had threatened plaintiff, but had not at that time identified plaintiff as involved in the murder.  (Blaker Aff. ¶ 6; Benton Aff. ¶ 8).

In addition to interviewing Marty, in January 2003, Benton and Blaker also interviewed Brad Ball.[5]  (Blaker Aff. ¶ 7; Benton Aff. ¶ 9).  Benton also made notes during this interview.  (Benton Aff. ¶ 9 and Exh. 2).  Brad related that plaintiff had once told him that he had knifed a guy, for whom he was making runs to California, that person being Ron Bruner.  (Blaker Aff. ¶ 8; Benton Aff. ¶

---

[5]According to defendants, Brad appeared of sound mind, spoke clearly, and recalled the events he described without suggestion.  (Blaker Aff. ¶ 11; Benton Aff. ¶ 13).

-4-

10).  Brad also stated in the interview that plaintiff[6] and others knifed Bruner because Bruner had refused to fund the drug runs to California.  (Blaker Aff. ¶ 8; Benton Aff. ¶ 10).  Afterwards, according to Brad's recollection of what plaintiff said, the killers had loaded Bruner's body into plaintiff's white van and then changed their minds, and took him back inside.  (Blaker Aff. ¶ 8; Benton Aff. ¶ 10).

At the time of the interview, Brad mentioned certain aspects of the Bruner murder which had not been released to the public.  (Blaker Aff. ¶ 9; Benton Aff. ¶ 11).  These facts, according to defendants, included the fact that money, guns and drugs had been stolen from the house where Bruner was killed, and that Bruner's body was not found in the same position it was in at the time of the killing.  (Blaker Aff. ¶ 9; Benton Aff. ¶ 11).  According to defendants, the change in positions of Bruner's body was evident because Bruner was found on his back, while thumb prints revealed that Bruner's body had once lain on its stomach.  (Blaker Aff. ¶ 9; Benton Aff. ¶ 11).  Additional evidence was found which defendants allege was consistent with a moving of the body.  (Blaker Aff. ¶ 10; Benton Aff. ¶ 12).  Benton and Blaker knew that the body had been covered with a comforter because it had been found that way, which defendants allege

---

[6]Both Affidavits state that "Bruner and others knifed him," but the court concludes that this was a typographical error and that Blaker and Benton both intended to say that plaintiff and others had knifed Bruner.  This is consistent with Benton's notes.  (Benton Aff. Exh. 2).

would be consistent with the lack of a blood trail between the position of Bruner's body and the back door.  (Blaker Aff. ¶ 12; Benton Aff. ¶ 12).

After the interviews with Marty and Brad, all information regarding the investigation, including the interviews, was turned over to Prosecutor Stephen S. Pierson, for the preparation of a Probable Cause Affidavit for the arrest of plaintiff and others.  (Blaker Aff. ¶ 13; Benton Aff. ¶ 15).  Blaker signed the Probable Cause Affidavit on January 17, 2003.  (Blaker Aff. ¶ 14).

The Affidavit stated that Blaker had "reason to believe that on or about February 27 or February 28, 1997, the persons known as . . . Leonard Profitt . . . Johnny Wayt . . . [and] John P. Wilson . . . did then and there murder Ron Bruner . . . ."  (Blaker Aff. Exh. 1).  The Affidavit explained that the facts supporting the grounds for arrest of these three individuals were as follows:

1. [Blaker is] an officer with the Jackson County Police Department.
2. In the course of [his] duties [he], and other officers of the Jackson County Police Department, have had occasion to:
   a. Investigate the murder of one Ron Bruner, murdered on February 27 or 28, 1997, in Jackson County, Indiana.
   b. Review the taped and/or transcribed interviews with witnesses and suspects in the investigation made from and after February 28, 1997, and continuing to this date.
   c. Meet with two confidential informants during December 2002 and January 2003, said confidential informants being numbers 125 and 130, both of said confidential informants having provided accurate and reliable information to the undersigned and other police officers over the last three (3) years resulting in numerous arrests and several convictions in a number of criminal cases in Jackson and Jennings Counties.

d.   Learn from interviews with the said confidential informants, conducted separately, that on or about February 27, 1997, John P. Wilson, Leonard Profitt and Johnny Wayt met together and planned to go to the home of Ron Bruner in Vallonia, Jackson County, Indiana, to rob and murder Ron Bruner because of certain disputes over the conduct of illegal drug transport and sale, and to obtain money, drugs, and guns which Wilson, Profitt and Wayt knew to be in the home of Bruner.

e.   Further learn from said interviews with the confidential informants that Wilson, Profitt and Wayt went to Bruner's home in a white or light colored van owned by Wilson, and went inside to meet with Bruner where Wilson stabbed Bruner repeatedly with assistance from Profitt and Wayt, until Bruner died from blood loss and the effects of the stab wounds.

f.   Further learn from the interviews [of] the confidential informants that Wilson, Profitt and Wayt carried Bruner's body to Wilson's van to transport it from the scene, but changed plans and brought the body back inside the Bruner residence and placed it on the floor, then searched the home for money, drugs and guns, stealing same, and left the residence, locking the doors behind them.

g.   Noted from the interviews that the confidential informants possessed information about the murder and the crime scene which were never released to the public, but which must have been given to the informants by a person who was present during the murder that that [sic] the source of the information to both confidential informants made on two separate occasions, was one of the participants who stabbed Bruner.

h.   Also learned from a taped interview made on April 2, 1997, that an individual named Eddie Bryant voluntarily contacted the Jackson County Police following the murder of Bruner and gave a statement [to] then Deputy Sheriff Hounshel. In the statement he described being asleep at the residence of Leonard Profitt on February 21, 1997, when Johnny Wayt arrived at the residence, awakened Bryant by knocking loudly on the door. Bryant remained where he was and tried to go back to sleep when Wayt and Profitt,

-7-

probably thinking that Bryant was asleep, discussed robbing Bruner, who, from the conversation, was obviously one of their drug suppliers. During the conversation, Wayt told Profitt that Bruner had "a bunch of guns" and that he would be getting a new batch of crank (methamphetamine) in soon. The said Eddie Bryant pretended to be asleep during the entire discussion.

i.    Also learned from a March 27, 1997, interview with Shannon Weber, that she, Leonard Profitt, and Johnny Wayt were all together at Weber's residence earlier in the evening of February 27, 1997, until at least 9:00 p.m.

j.    Reviewed the autopsy report on the death of Ron Bruner and learned that the time of death was approximately midnight on the night of February 27-28, 1997.

(Blaker Aff. Exh. 1).

Defendants allege that, prior to signing the Probable Cause Affidavit, Blaker attempted to investigate Wilson's ownership of a white van, but was not able from official records to confirm this.  (Blaker Aff. ¶ 15).  Also prior to signing the Probable Cause Affidavit on John Wilson, Blaker had voice stress tests done on both Marty Ball and Brad Ball, and both passed.  (Blaker Aff. ¶ 16).  At the time he first began talking to Brad, Blaker alleges that he had no information regarding Brad's credibility.  (Blaker Aff. ¶ 17).  And, by the time he signed the Probable Cause Affidavit, he had learned that Brad had been an informant for Dave Turner of the Jennings County Sheriff's Office.  (Blaker Aff. ¶ 17).

Contrary to the language in paragraph 2c of the Probable Cause Affidavit, Blaker had never used Brad as an informant, and Brad had, in fact, never been used as an informant by any officer of the Jackson County Police Department. (Deposition of Rick Blaker ("Blaker Dep.") at 19; Deposition of Brad Ball ("Brad

Ball Dep.") at 11).[7]  In addition, Marty claims that, contrary to the information provided in paragraphs 2d, e and f of the Probable Cause Affidavit, she never told Blaker that Wilson or anyone else stabbed Bruner; she never mentioned a motive (including a dispute over drugs or guns); and never mentioned anything about individuals transporting Bruner's body and then changing their minds. (Deposition of Martha Ball ("Marty Ball Dep.") at 16-20).  And, Brad claims that he never suggested that the murderers stole guns after killing Bruner or that the individuals locked the doors behind them when they left Bruner's home.  (Brad Ball Dep. at 16-18).

Blaker also left out certain facts from the Probable Cause Affidavit.  For instance, the Probable Cause Affidavit does not reveal that Brad's testimony was obtained while he was in the Jackson County jail on a pending burglary charge.  (*See* Brad Ball Dep. at 9-10).  Nowhere in the Probable Cause Affidavit is it revealed that both Brad and Marty had criminal records that included crimes of dishonesty.  (Brad Ball Dep. at 7; Marty Ball Dep. at 7).  Additionally, the Probable Cause Affidavit, which suggests that two individuals gave similar accounts about the murder of Bruner, fails to mention that Brad and Marty were married.  (*See* Marty Ball Dep. at 9).  The Probable Cause Affidavit also does not mention that both Brad (on methamphetamine) and Marty (on crack cocaine) were intoxicated when plaintiff made the alleged incriminating statements.

---

[7]When Blaker read the Probable Cause Affidavit, he read paragraph 2c without understanding it to be a representation that he had ever personally used Brad as a confidential informant; he read it to refer to Brad's reliability having been established by another police officer.  (Blaker Aff. ¶ 21).

(Brad Ball Dep. at 18; Grand Jury Testimony of Marty Ball at 13).  Finally, the Probable Cause Affidavit makes no mention of any deal with Marty and Brad to give testimony in exchange for leniency in pending burglary charges.  In fact, Brad claimed that he was told by Blaker that he could "talk turkey" which he interpreted to mean making a deal, and one month after the Probable Cause Affidavit was issued, burglary charges in Jackson County against Brad and Marty were dropped.  (Brad Bell Dep. at 13-14; Brief in Response to Defendants' Motion for Summary Judgment at Exh. 7).

Blaker alleges that Marty had been a credible informant providing probable cause on several drug investigations and arrests that he had been responsible for prior to January 17, 2003.  (Blaker Aff. ¶ 18).

Following his arrest, plaintiff was incarcerated for 60 days without bail. He was eventually released, and the prosecution dismissed the murder charge against plaintiff.  (Brief in Response to Defendants' Motion for Summary Judgment at 1).  Plaintiff filed suit on January 14, 2005, against Blaker, individually and in his official capacity, and against Hounshel, in his official capacity.  (Complaint at 2).  In his Complaint, plaintiff alleges that:  (1) Blaker gave testimony in the Probable Cause Affidavit that he knew or should have known failed to establish probable cause; (2) Blaker provided false or misleading information in the Probable Cause Affidavit; (3) Hounshel failed to properly hire, train or supervise Blaker; (4) these actions violated plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution; and (5)

-10-

plaintiff suffered loss of liberty, loss of employment, deprivation of civil rights, damage to his character, extreme emotional distress and attorney's fees. (Complaint at 2). Plaintiff seeks damages, including punitive damages and attorney's fees. (Complaint at 3-4).

Defendants filed the pending Motion for Summary Judgment claiming that Hounshel is entitled to summary judgment because plaintiff has failed to demonstrate an improper custom or practice that lead to his arrest and because Hounshel was not involved in the creation of the Probable Cause Affidavit. Defendants also claim that Blaker is entitled to summary judgment because plaintiff's arrest was supported by probable cause. Finally, defendants argue that Blaker, in his individual capacity, is entitled to qualified immunity.

The court concludes that, for the following reasons, defendants' Motion for Summary Judgment should be **GRANTED, in part, and DENIED, in part.**

## III.  Summary Judgment Standard

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). The motion should be granted so long as no rational fact finder could return a verdict in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, a court's ruling on a motion for summary judgment is akin to that of a directed verdict, as the

question essentially for the court in both is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.  When ruling on the motion, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences therefrom in that party's favor.  *Id.* at 255.  If the nonmoving party bears the burden of proof on an issue at trial, that party "must set forth specific facts showing that there is a genuine issue for trial."  FED.R.CIV.P. 56(e); *see also Silk v. City of Chicago,* 194 F.3d 788, 798 (7th Cir. 1999).  Lastly, the moving party need not positively disprove the nonmovant's case; rather, it may prevail by establishing the lack of evidentiary support for that case.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## IV.  Analysis

### 1.  Plaintiff has Abandoned His Claim Against Hounshel

Plaintiff has conceded that he does not have evidence to support a claim against Hounshel.  (Brief in Response to Defendants' Motion for Summary Judgment at 4-5).  The court, therefore, concludes that defendants' motion, as to defendant Hounshel, is **GRANTED.**

### 2.  Plaintiff's Claims Against Blaker

Blaker moved for summary judgment on plaintiff's wrongful arrest claims arguing that any defects in the Probable Cause Affidavit were minor and that these alleged defects cannot distract from the fact that plaintiff's arrest was

supported by probable cause.  The court concludes that questions of fact remain regarding whether or not probable cause to arrest plaintiff did, in fact, exist.

### A.  Probable Cause Will Defeat a Claim of Unlawful Arrest

The existence of probable cause works as an absolute bar to a section 1983 claim for unlawful arrest.  *Smith v. City of Chicago,* 913 F.2d 469, 473 (7th Cir. 1990).  However, an officer procuring an arrest warrant enjoys only qualified, and not absolute, immunity with respect to his actions in the application of the warrant.  *Neiman v. Keane,* 232 F.3d 577, 579 (7th Cir. 2000).  And, "if the underlying facts supporting the probable cause determination are not in dispute, the court can decide whether probable cause exists."  *Maxwell v. City of Indianapolis,* 998 F.2d 431, 434 (7th Cir. 1993).  In this instance, there are significant factual disputes surrounding the underlying facts, and the court cannot conclude, as a matter of law, that probable cause existed to arrest plaintiff.

An officer who procures a warrant is immune from suit unless a showing is made that the "warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable."  *Malley v. Briggs,* 475 U.S. 335, 344, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).  Such a lack of indicia of probable cause can be found when a police officer fails to inform the judicial officer of facts that would negate probable cause or when the officer, in his representations to the judicial officer, recklessly disregards the truth.  *Neiman,* 232 F.3d at 580.  "In determining whether information submitted to a judicial

-13-

officer in support of a warrant application was sufficient to establish probable

cause, we look only at what the officer knew at the time he sought the warrant,

not at how things turned out in hindsight.  *Beauchamp v. City of Noblesville, Ind.,*

320 F.3d 733, 743 (7th Cir. 2003).

### B.  Developing Probable Cause Through Use of Confidential Informants

In this instance the facts indicate that tips from two confidential

informants were the basis of the probable cause necessary for plaintiff's arrest.

When determining whether an informant's tip establishes probable cause, courts

are to use a totality-of-the-circumstances approach.  *See Illinois v. Gates,* 462

U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).  An informant's veracity,

reliability and basis of knowledge are all to be considered.  *U.S. v. McClellan,* 165

F.3d 535, 546 (7th Cir. 1999).  However, these are not independent elements,

but must be looked at as a whole; a deficiency in one may be compensated for by

a strong showing of another, or by some other indicia of reliability.  *Id.*

### C.  Questions of Fact Remain Concerning the Existence of Probable Cause

The court, in this case, cannot conclude, as a matter of law, that probable

cause existed because, in the light most favorable to plaintiff, Blaker's Probable

Cause Affidavit fails to inform the judicial officer of numerous facts which weigh

on the veracity, reliability and basis of knowledge of both Marty Ball and Brad

Ball.  First, as to both Marty and Brad, the Probable Cause Affidavit fails to point

-14-

out their marital relationship and blurs their testimony to suggest that they both testified to all of the allegations in paragraphs 2d through 2f.

Second, as to Brad individually, there were numerous instances by Blaker of a failure to inform the judicial officer of facts concerning Brad's reliability, veracity and basis of knowledge.  Regarding Brad's reliability, no mention was made of the fact that he was a newly-arrested informant.  Yet, a newly-arrested informant "merits a greater dose of skepticism when assessing his credibility." *U.S. v. Olson,* 408 F.3d 366, 370 (7th Cir. 2005).  And, the Probable Cause Affidavit does not indicate that Brad was providing testimony against plaintiff in exchange for leniency with pending burglary charges, despite Brad's insistence that that is what occurred.  Finally, in reading paragraph 2c of the Probable Cause Affidavit, the court is left with the impression that Brad had given prior information to Blaker and other Jackson County officers, yet he had not.  All of these facts raise serious questions about Brad's reliability.  Regarding Brad's veracity, no mention is made of his previous arrest for a crime of dishonesty. And, regarding Brad's basis of knowledge, no mention is made of the fact that Brad was on methamphetamine when plaintiff allegedly told him the story of Bruner's murder.  Brad and Marty's marital relationship could also have impacted his basis of knowledge, yet this fact was not disclosed in the Probable Cause Affidavit.  Both of these exclusions from the Probable Cause Affidavit are troubling.  As discussed above, however, a lack of reliability, veracity or basis of knowledge *could* be remedied by some other indicia of reliability.

-15-

In this case, such indicia of reliability might be found in corroborating testimony.  But, Brad has testified that he did not provide some of the information in the Probable Cause Affidavit, such as the fact that the murderers allegedly stole guns from Bruner, or that they locked the door on their way out, or that they were using a white van.  Excluding these facts from Brad's testimony, the court cannot conclude, as a matter of law, that Brad's testimony had enough indicia of reliability to overcome the problems with his reliability, veracity and basis of knowledge.

Third, as to Marty, individually, there are problems with her testimony as well.  It is possible that, even with the problems concerning Brad's testimony, probable cause still could have existed to arrest plaintiff if Marty's testimony was substantial enough to warrant a finding of probable cause.  But, the court cannot conclude in this instance, as a matter of law, that her testimony alone supported such a finding.  As to the issue of Marty's veracity, Blaker failed to include evidence of a crime of dishonesty, and as to Marty's basis of knowledge, Blaker failed to disclose that she was smoking cocaine at the time that plaintiff made the alleged incriminating statements.  And, Marty's testimony was misrepresented in paragraphs 2d through 2g of the Probable Cause Affidavit. The only statements that Marty made to Blaker were that plaintiff had approached Marty at some point before Bruner's murder had been revealed in the newspapers and informed her that "they just knifed a guy."  Plaintiff had never mentioned to Marty that Bruner was the victim.  Additionally, according to

Marty, she never told Blaker that Profitt or Wayt were involved, and never provided any of the information in paragraph 2f of the Probable Cause Affidavit except that she said she cleaned some blood out of plaintiff's van several days afterward.

The court concludes that, in light of these numerous alleged omissions and mischaracterizations in the Probable Cause Affidavit, the court cannot determine as a matter of law that probable cause existed to arrest plaintiff. Because Blaker signed the Probable Cause Affidavit and, in the light most favorable to plaintiff, acted with at least reckless disregard in leaving out facts that could have negated probable cause, defendants' Motion for Summary Judgment must be **DENIED.**

## V. Conclusion

For the reasons outlined above, Defendants' Motion for Summary Judgment is **GRANTED, in part, and DENIED, in part.**  Plaintiff's claim against Hounshel is **DISMISSED**.  Plaintiff's claims against Blaker remain for further adjudication.

**SO ORDERED.**

**Dated:**  08/09/2006

WILLIAM G. HUSSMANN, JR.
Magistrate Judge

**Electronic copies to:**

Bradley Aaron Johnson
DOVE  AND JOHNSON PC
dovejohnsonpc@yahoo.com

Michael Roy Morow
STEPHENSON MOROW & SEMLER
mmorow@stephlaw.com